Good morning, Your Honor. My name is Stuart Mermelstein. I'm with the law firm of Herman and I represent in this appeal, there are two consolidated appeals. I represent the South Fork Band of Appellants. Mr. Hager represents the Western Shoshone National Council, which is a separate group of appellants. We were going to split our time 3-2 and 3-2. You sit down when you are ready to sit down and whatever will be left on the clock will belong to your co-counsel, unless you want to reserve some of it for a bottle. Thank you for your time. All right. Thank you, Your Honor. This appeal concerns the statute of limitations under the Quiet Title Act and constructive notice under the Quiet Title Act. Accountant 1 of the complaint filed in the court below seeks to acquire title to recognize title or treaty title of the Western Shoshone people under the Treaty of Ruby Valley. As I understand it, the way it works is you are there owning your land, owning your land, and all of a sudden you get notice that the United States has a claim on this land. You don't have to have a letter from the United States government. You just have to have some reasonable notice. And you mean to stand there and tell me that until 12 years ago or less than 12 years ago, your clients did not have notice that the United States had a claim on those titles of that land? Is that really what, I mean, after the years of litigation over the land, the 1945 ICC claim? I mean, all the repeated actions, litigating, you had no inkling that the United States claimed title to it? You have to look at the particular interest in land being claimed involved. Why don't you answer my question, and then I'll do what you want me to do. Okay. I've asked you a question. And the question is you can answer it yes or no or I don't know or, you know, something of that sort. So why don't you take a stab at answering? Do you understand my question? I believe I understand your question. And the answer is the litigation that you refer to all involves something else, a different interest in property. Aboriginal title. Do you understand my question? Your question is how did the client? No. Okay. The question is the question I asked, not the question you want me to ask. I understand. Your clients had no inkling that the United States had a claim to this property prior to 12 years ago. No idea that the United States believed that this property belonged to it. Prior to? You know, go back 12 years. Yes. Going back 12 years, our clients. No idea that the United States thought the land belonged to it. Did not know that the, right. Had no inkling. That the government challenged recognized title or treaty title to the land under the Treaty of Reroute Island, which had never been litigated. I'm going to give you one more chance to answer my question. Okay. And after that, we can go on. And if you don't want to give me an answer, that's okay. Okay. Okay. Prior to 12 years ago, did your clients have any idea that the United States thought this was its own land? No. No idea. Well. Just didn't have any idea that the United States thought this land belonged to it. No inkling whatsoever. That's your position. Your Honor, let me put it this way. To the extent that they had some inkling, whatever inkling they had was ambiguous and vague on the government's part. There had never been any unambiguous or direct claim. So they saw the United States up until 12 years ago thought that the land belonged to your clients. Up until 12, you know, up until about 12 years ago, they thought, gee, the United States concedes that this is our land. What the. Is that what you're saying? What the government thought. Is that what you're saying? Yeah. I mean, if the government thought that it was their land, they had never challenged it. They had never done something to challenge the recognized land under the treaty. Your client thought the United States agreed that the land belonged to them. That's what you're saying. The United States itself had no claim in the land. Correct. They had made no claim to the recognized title. That's what your client thought. Until 12 years ago, the United States conceded that the land belonged to your clients. The United States, I don't know that they conceded it, but they never challenged it. They never challenged the recognized title. They only the only issue that had been litigated was aboriginal title, Your Honor. And if it pleases the Court, I'd like to, in dividing my time, I'd like to provide something to you. In answer to your question, my clients, the United Nations and the Organization of American States, still believe the land belongs to the Western Shoshone. No, no. The question is not what they believe. The question is did they have any idea the United States disagreed and thought that it was land that belonged to the United States. There are 10,000 Western Shoshone all the way from Death Valley up into Idaho. And I can tell you that there are some of them. So why is it when I ask these questions I don't get a straight answer? Did your clients reasonably believe that the United States thought, gee, this is our land and the United States has no claim to it?  And that's a question of fact for the trial court. It's not a matter for a dismissal. It's a matter of fact. How do you take that position since the United States has been finding tooth and nail about this for 40 years? Because not every Western Shoshone ever had notice of that. This is the type of ‑‑ if this was a case that was looked at in the ordinary course, there's no way that this Court would find that adequate notice was given to the individual Western Shoshones with regard to what was prescribed. I see. So you're saying there are some people in the outlying reservation. Absolutely no notice whatsoever, Your Honor. Didn't have any idea. If this had been a class action, the type of notice that the Court's familiar with in terms of individual notice to Western Shoshones, it would be different. But that never happened. How about the tribal leadership? Did they ‑‑ It was not even tribal leadership. What happened, it was a recognizable band that was selected by the United States to pursue claims that were selected by the United States by a lawyer that was selected by the United States. And when the Indians objected and said we don't want that lawyer and we don't want to pursue those claims, they were stopped. They were prevented from selecting their own attorney and be represented by their own counsel. This is why the United Nations and the Organization of American States, when they have looked at this, have concluded that this process stinks. So the answer to that is no. They did not have notice that the United States was claiming that they owned that land. And to this day, the treaty has never been litigated. And that treaty title exists. Do they have notice now? No. They still believe that they have treaty title, and that's what this litigation is about. At some point, this has to be looked at by the Federal courts in the United States, just like ‑‑ So your position is they never get notice. There was never notice that the United States has claimed the title. Even though they send a lawyer all the way from Washington to fight you about this, the United States has no claim to title. Your clients reasonably believe, even today, that the United States makes no claim to this land. There are a lot of western Shoshones. That's absolutely true, Your Honor. There are 10,000 spread out. Some of them live an indigenous lifestyle out in the middle of nowhere. One of them is here in the courtroom today. The type of notice that we're talking about, that we're familiar with, has never occurred to the western Shoshone. And there was no representative ‑‑ I understand what type of notice you're talking about. Thank you. Okay. Okay. Did you want to say the rest of your time or rebuttal? Yes. Thank you. Okay. We'll hear from the government. Good morning. May it please the Court. My name is Stacey Person, and I am here on behalf of the United States. In their brief, and again today, appellants assert that they timely filed an action seeking to quiet title to the disputed lands. But the record clearly establishes that that is not the case. The longstanding dispute between the appellants and the United States over ownership of the disputed lands, which has played out in over 50 years of litigation, put the appellants on notice more than 12 years before they filed this suit that the United States claims an interest in the land. And thus, their suit is time barred by the Quiet Title Act. What about this claim that there are Indians off on the reservation that don't get notice? I have no idea. Well, Your Honor, a couple of responses. The notice in this case, it's relevant to the plaintiffs in this case. And these plaintiffs were involved in some of the prior litigation. Their predecessors and interests were involved in the prior litigation. For example, the Timok bands are part of the plaintiffs in this case, and they were the representative group during the ICC proceedings. So they certainly had notice of those litigation proceedings. And as to the most important thing here is that these plaintiffs, these appellants, did have notice. Just almost as an aside, as to the other individual Western Shoshone people, they would be charged with constructive notice of published judicial decisions that go to these disputed lands and that demonstrate that the United States claimed an interest in these lands. Okay. Thank you. If the Court has no further questions. Thank you. We ask that the judgment of the District Court be affirmed. Thank you. You've got a couple of minutes left for rebuttal. I'm sorry, Your Honor. You have some time left on the clock. Okay. Thank you. The issue under the Quiet Title Act is whether the plaintiff was reasonably aware of the claim of the United States. It's not whether there was something in the government's mind that may have caused the government to think that there was no treat of the title. It's not whether they had some inkling. It's whether the plaintiff was reasonably aware. They were involved in litigation with the government over this very land. Over a completely different property interest, Your Honor. An aboriginal title, a treaty title. Different property interest, but not a different land. And so long as the United States is there litigating some property interest in the land, your clients are aware that the government, in fact, claims some title of the  That's all that you need for a notice of the land. Well, Your Honor, you know, this comes under the cases cited in our papers, the Fatum case and the Mischel case. In Mischel, again, you had a dispute to the same land between the government and the plaintiff, but that was a right of way or an easement versus fee title because there were different property interests. The court held, the Ninth Circuit held. Well, there's quite a bit of difference. It's fairly consistent. But there's quite a bit of difference between litigating whether you have a right of way across land and whether you have fee title under two different theories. Well, it's --. I mean, really what you're arguing is two different theories. You're arguing that we had notice under one theory, but we didn't have notice under the other theory, and then you're trying to say to me, but because I can argue that one didn't have a right of way or the right to go across my land, and that's different than whether I own the land, that that's a different notice. Your Honor, that is. If you're ‑‑ for example, if you have a leasehold interest and you're divested of possession of property, that ‑‑ if you own the property, you still own it. If you no longer possess it, you no longer possess it, but you still own the property. Different property interests. I mean, that's something that we see in Idaho every day, where a guy is walking across your land every day, and he's walking across your land every day, and he's walking across your land every day, and does he have notice, does the owner have notice that he's walking across your land, or that somebody is being asked to give up title, and do they notice they're going to give up title? Now, there's a difference between a right of way across, which is just an easement, and a difference between ownership. Now, that may be different, but we're talking about ownership and different ways to attract the ownership. And the government went right after you about ownership. In all of these cases, it's my worry that you're trying to confuse the doctrine by citing the cases on easements as relate to ownership. Nobody is establishing ownership with an easement. Your Honor, I understand. But, again, the ‑‑ there's an analogy here because the interests are very different. Aboriginal title is a possessory interest based on continuous use and occupancy of the land. If you stop occupying the land, then your aboriginal title can be extinguished. It no longer exists. But if you have treaty title, you still own the land. So there ‑‑ and, again, it's comparable to a leasehold and a fee title. You're suggesting it is comparable? You're suggesting that aboriginal rights is only as good as an easement? No. I hope not. I'm suggesting it's comparing one to the other. Okay. Is that you could lose a possessory interest and still have your right to fee title in the land. Okay. Thank you, counsel. In case you're sorry, we'll stand some minutes. That's our calendar for the day. We're adjourned. Thank you. Thank you.
judges: Kozinski, Gould, Smith